Filed 6/16/14  Estate of Langman CA6

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SIXTH APPELLATE DISTRICT

| | |
|---|---|
| Estate of KIRK LANGMAN, Deceased. | H038800<br>(Monterey County<br>Super. Ct. No. MP20486) |
| DAVID LANGMAN,<br><br>　　　Petitioner and Respondent,<br><br>v.<br><br>MICHAEL GREENE,<br><br>　　　Objector and Appellant. | |

Kirk Langman (Kirk or decedent)[1] died without a will and left no surviving children or spouse.  Michael Greene (Greene) and David Langman (Langman), the father of decedent, each filed a petition for appointment as the administrator of the decedent's estate and objected to the other's petition.  Both petitions requested letters of administration and authorization to administer under the Independent Administration of Estates Act (IAEA) (Prob. Code, § 10400 et seq.).[2]

---

[1]　We will refer to Kirk Langman by first name for the sake of clarity and not out of disrespect.

[2]　All further statutory references are to the Probate Code unless otherwise stated.

One of Greene's grounds for objection was that he was the putative registered domestic partner of the decedent and, therefore, he had priority over Langman for appointment. Under Family Code section 297, subdivision (a), domestic partners are defined as "two adults who have chosen to share one another's lives in an intimate and committed relationship of mutual caring." To establish a domestic partnership in California, both persons must "file a Declaration of Domestic Partnership with the Secretary of State pursuant to [Division 2.5 of the Family Code], and, at the time of filing," meet all other specified requirements. (Fam. Code, § 297, subd. (b).) A surviving domestic partner has top priority for appointment as administrator of his deceased domestic partner's estate. (See §§ 37, 8461, subd. (a).)

At the close of Greene's evidence at the hearing on the petitions, the trial court granted Langman's motion for judgment pursuant to the Code of Civil Procedure section 631.8. The court concluded that Greene and decedent were neither registered domestic partners nor putative registered domestic partners and, therefore, Greene did not have priority over Langman for appointment. It denied Greene's objections. A judgment was entered in favor of Langman and Greene appealed.

On appeal, Greene claims that the probate court erred by granting the motion for judgment without affording him the opportunity to present rebuttal evidence, the court's findings related to his alleged putative status were unsupported by substantial evidence and the product of bias, and the court failed to properly analyze the putative spouse doctrine. Greene further asserts that the court erroneously placed the burden of proof of ownership of personal property on him and the court's finding that the estate did not have any property belonging to him was unsupported by substantial evidence. Lastly, Greene maintains that the court abused its discretion by imposing a discovery sanction of $4,500 on him in connection to respondent Langman's motion to compel Greene's deposition.

2

We will affirm the judgment.[3]

## I

### *Procedural History*

On October 11, 2011, Langman filed a petition for letters of administration and authorization to administer his son's estate under the IAEA. Greene filed a written objection to Langman's petition.

Appellant Greene objected to Langman's appointment as administrator of decedent's estate on a number of grounds, including the ground that he had priority to administer the estate as decedent's putative registered domestic partner. He further objected on the ground that Langman had "embezzled from, mismanaged the assets of, and committed fraud on the decedent's estate and objector's property," citing section 8502, subdivision (a).[4] The objection contained allegations that Langman had "removed for his own use every important financial and personal document, memento, and item . . . belonging to objector, the decedent or both" from the Pebble Beach residence and "Langman cannot be trusted to include that property in the estate or determine its ownership."[5]

---

[3] We deny appellant's requests for judicial notice of (1) "Sexual Orientation Fairness in the California Courts," Final Report of the Sexual Orientation Fairness Subcommittee of the Judicial Council's Access and Fairness Advisory Committee (Jan. 2001), (2) CJER Bench Handbook, Fairness and Access (Rev. 2010), and (3) three documents filed in the superior court after appeal. "Reviewing courts generally do not take judicial notice of evidence not presented to the trial court. Rather, normally 'when reviewing the correctness of a trial court's judgment, an appellate court will consider only matters which were part of the record at the time the judgment was entered.' [Citation.]" (*Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 444, fn. 3.)

[4] Section 8502 actually states the grounds for removing a personal representative from office, including the ground that that "[t]he personal representative has wasted, embezzled, mismanaged, or committed a fraud on the estate . . . ." (§ 8502, subd. (a).)

[5] The written objection also indicated that the title to the Pebble Beach property disclosed that decedent had a 95 percent interest in the property and Langman had a five percent interest in the property. The objection alleged that Langman "fraudulently

3

In support of the latter objection, Greene alleged that he had sold music equipment, which he and decedent had purchased, for $18,000 after Langman and his wife told him that "they considered that all the property in the house belonged to [him] and . . . he should now sell some of [it] . . . so that [Greene] would have sufficient funds on which to live for the next few months."

Greene's objection alleged the Langmans arrived on Friday September 30, 2011, with a sheriff's deputy and threatened that they would have him arrested for committing grand theft and trespassing if he did not vacate the property by Sunday October 2, 2011. It was averred that the Langmans subsequently made a false report of grand theft based on Greene's selling of the music equipment and caused his arrest and sheriff's deputies seized the $18,000, which was never returned to him.

According to the written objection, "the Langmans had a cleaning crew, moving truck, and a dumpster brought to the residence and removed everything of value including [Greene's] pictures, music recordings, artwork, important financial and personal papers, the safe, its contents, and computer in [Greene's] room . . . ." A partial list of allegedly seized property was attached to the document. The objection states "much of the property that was taken by the Langmans was owned by [Greene]."

On December 9, 2011, Greene filed a petition for letters of administration and authorization to administer the deceased's estate under the IAEA. Langman filed a written objection to Greene's petition.

By order filed on February 7, 2012 following a case management conference, the court required Greene to provide to opposing counsel "a list of all personal property to which he claims he has an ownership interest, either individually or through his alleged

conveyed title" to the Pebble Beach residence to himself by executing and recording an "Affidavit-Death of Joint Tenant" on October 19, 2011. On appeal, Greene has not raised any specific issue regarding the real property.

4

status as a putative registered domestic partner of the decedent Kirk Langman." The court also required Langman to make the personal property that was removed from the decedent's residence and currently in storage available for inventory by Greene and his counsel. An evidentiary hearing was scheduled for April 23, 2012.

On February 29, 2012, Langman moved to compel Greene's deposition and for sanctions in the amount of $5,360 based on the attorney fees incurred to file the motion. The supporting memorandum of points and authorities stated that Greene had "twice refused to have his deposition taken as noticed." A supporting declaration indicated that Greene's deposition was originally set for February 17, 2012 but it was rescheduled to February 28, 2012 to accommodate Greene based on his counsel's representations that Greene was undergoing oral surgery on February 6, 2012 and Greene wanted to make sure that "he would not be under the effects of any oral surgery medication." The declaration indicated that, on February 22, 2012, appellant Greene's counsel had informed opposing counsel that the surgery had not taken place and his surgery date was uncertain because the original oral surgeon had not accepted Greene's insurance and Green was looking for another surgeon. Nevertheless, Greene was physically unable to attend his deposition scheduled for February 28, 2012. Appellant's counsel represented that appellant had " 'ongoing back pain' from a workers' compensation injury" and he lacked pain medication because he was "awaiting reassignment to a new workers' compensation doctor." The declaration stated that Greene had been unwilling to commit to a specific date for deposition despite the pending evidentiary hearing.

Counsel Dennis McCarthy's declaration in support of the sanction request indicated that his hourly rate was $350 and his attorney's fees for preparing and bringing the motion totaled $5,360. That total amount included an anticipated three hours for responding to any opposition to the motion and attending the motion hearing.

5

The declarations of appellant and his counsel were filed in opposition to the motion to compel and sanction request. Langman filed a reply to the opposition and his declaration.

On March 9, 2012, the court ordered Greene's deposition to be taken on March 20, 2012. The sanction matter was set for hearing on April 6, 2012. On April 6, 2012, after argument, the sanction issue was taken under submission. By written order filed April 10, 2012, the court awarded $4,500 as a sanction to Langman.

Before the hearing on the petitions, appellant Greene filed a number of declarations: (1) the declaration of Jodi Dionne, Greene's half sister, (2) the declaration of Don Dionne, Jodi's husband, (3) the declaration of Fred Greene, Greene's brother, (4) the declaration of Phyllis Greene, Greene's stepmother, (5) the declaration of Stuart Hoffman (6) the declaration of Maria Romanello and (7) the declaration of Matt Sutherland.

The hearing on the petitions and objections began on April 23, 2012. On that date, appellant Greene filed the declaration of Howard Postelthwaite.

On April 24, 2012, respondent Langman filed a legal memorandum in support of his objection to the admission of declarations into evidence.

At the hearing on April 24, 2012, after counsel for respondent Langman called two witnesses out of order, counsel for appellant Greene rested. Respondent's counsel then made an oral motion for judgment pursuant to Code of Civil Procedure section 631.8. After extensive discussion, the court indicated that it was inclined to grant the motion.

Appellant's counsel indicated that the court should consider the declarations and explained that the declarants, aside from Mr. Dionne (who had testified), were unavailable because they were either out of the country or out of state. Counsel for respondent Langman indicated that there was no evidence that any of the declarants had been subpoenaed to appear at the hearing.

6

The court asked whether, apart from a declaration, counsel had any evidence to present in light of its tentative ruling on the motion for judgment. Greene's counsel indicated that he had had a couple of questions for Greene and that he would like Jodi Dionne to discuss Greene's state of mind a day or two after Kirk died and what Greene had told her. The court expressed its uncertainty whether this would be rebuttal testimony or "something new."

Counsel subsequently indicated that he wished to recall Greene with regard to whether he understood that the Sheriff's deputies were asking for his legal status with respect to decedent. The court made clear that it was not going to admit any evidence presented by declaration.

Greene again took the witness stand and his counsel examined him. Next, his counsel indicated that he was making an offer of proof that "[a] declarant saw the domestic partnership declaration on the table a day after they signed it" and that is what the declarant would say if there was "any way [counsel could] drag him in here . . . to testify . . . ." The court stated that this was "the time for the trial."

The court granted respondent's motion for judgment. The court granted respondent's petition and denied appellant's petition. It ordered Langman appointed as administrator of decedent's estate. Letters of Administration were issued and filed on May 3, 2012.

The court's written statement of decision was filed on June 19, 2012.[6] A judgment in favor of respondent Langman and against appellant Greene was filed on the same date.

---

[6] Appellant Greene suggests that, since the probate court did not specifically address all his objections to the statement of decision, the doctrine of implied findings is inapplicable and this court may not imply any findings. To avoid application of that doctrine on appeal, an appellant must have complied with a two-step process: "[F]irst, a party must request a statement of decision as to specific issues to obtain an explanation of the trial court's tentative decision ([Code Civ. Proc.,] § 632); second, if the court issues such a statement, a party claiming deficiencies therein must bring such defects to the trial

7

## II

### *Evidence*

At the beginning of the hearing, the parties stipulated that Langman, as decedent's father, had priority to administer the decedent's estate absent a showing that Greene was a putative domestic partner.

A. *Witnesses Called by Appellant Greene*

1. *Donald Dionne*

---

court's attention to avoid implied findings on appeal favorable to the judgment ([Code Civ. Proc.,] § 634)." (*In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1134.) "[T]he trial court is not required to respond point by point to issues posed in a request for a statement of decision." (*In re Marriage of Burkle* (2006) 139 Cal.App.4th 712, 736, fn. 15.) " 'The court's statement of decision is sufficient if it fairly discloses the court's determination as to the ultimate facts and material issues in the case.' (*Golden Eagle Ins. Co. v. Foremost Ins. Co.* (1993) 20 Cal.App.4th 1372, 1380 . . . ; see also *Bauer v. Bauer* (1996) 46 Cal.App.4th 1106, 1118, 54 Cal.Rptr.2d 377 [trial court 'is not required to make an express finding of fact on every factual matter controverted at trial, where the statement of decision sufficiently disposes of all the basic issues in the case']; *In re Marriage of Garrity & Bishton* (1986) 181 Cal.App.3d 675, 686-687 . . . [trial court's statement of decision is required only to state ultimate rather than evidentiary facts].)" (*Ibid.*) Code of Civil Procedure section 634 provides in pertinent part: "When a statement of decision does not resolve a controverted issue, or if the statement is ambiguous and the record shows that the omission or ambiguity was brought to the attention of the trial court either prior to entry of judgment . . . , it shall not be inferred on appeal . . . that the trial court decided in favor of the prevailing party as to those facts or on that issue." "The clear implication of this provision, of course, is that if a party does not bring such deficiencies to the trial court's attention, that party waives the right to claim on appeal that the statement was deficient in these regards, and hence the appellate court will imply findings to support the judgment. Furthermore, section 634 clearly refers to a party's need to point out deficiencies in the trial court's statement of decision as a condition of avoiding such implied findings . . . ." (*In re Marriage of Arceneaux* , *supra*, 51 Cal.3d at pp. 1133-1134.) Appellant has not shown that the probate court's statement of decision was deficient.

Donald Dionne (Dionne), testified that Greene was his brother-in-law and the brother of his wife Jodi.[7] Dionne had known Greene since about 2000, when he met him at a family event. Dionne and Jodi were married in 2001 and they lived in West Los Angeles until 2004, when they moved to La Quinta, California near Palm Springs.

While the Dionnes were living in West Los Angeles, Dionne visited Greene's house. He heard Greene talking with Kirk over a speaker phone. Dionne learned that Greene had a close relationship with Kirk. At some point, Dionne heard Kirk "half jokingly" say that Greene "was his wife." Kirk said that he "really cared for [Greene], he loved him." Dionne attempted to strike up a friendship with Greene but that effort "quickly ended" and Dionne saw Greene just during the holidays.

During the 2004-2005 holiday season, Greene stayed with the Dionnes and helped with house painting. Greene was on the phone with Kirk at least once a day during this period.

Greene moved to Shadow Hills Estates, which is not far from La Quinta, in the spring or summer of 2005. Greene lived there for almost two years and worked at the Marriott.

At the family's celebration of Jodi's birthday, Greene announced he was moving to Los Angeles to live with Kirk. Dionne telephoned Kirk, who told Dionne that he was going to take care of Greene for the rest of his life. Dionne recalled telling Kirk to "put his money where his mouth was" and "create a domestic partnership with him."

Dionne did not see Greene much after Greene moved. Dionne saw Greene "at a couple of family events" and his conversations with Greene were "rather short."

According to Dionne, in about 2009, he called Kirk again to find out if Kirk had followed through with the domestic partnership. Kirk said, "yes, not to worry." Kirk told

---

[7] We will generally refer to Jodi Dionne by her first name for the sake of clarity and not out of disrespect.

him "not to say anything to anyone . . . ." Greene was "not open about his relationship with Kirk." Kirk and Greene moved after that and Dionne never spoke with Kirk again.

Dionne never saw a signed declaration of domestic partnership agreement between Greene and Kirk. Greene did not tell Dionne before Kirk died that Greene had signed a declaration of domestic partnership. Dionne did not actually know whether a domestic partnership declaration had been filed with the Secretary of State. He did not know whether Greene and the decedent ever had a sexual relationship. Dionne explained that he did not directly ask Greene about the domestic partnership because Greene was not as open about their relationship as was Kirk.

Dionne and Jodi had paid nearly $10,000 of Greene's costs in the litigation. Dionne was hoping that Greene would "be able to take care of himself so [they] don't have to take care of him for the rest of his life."

2. *Christina Miguel*

Christina Miguel testified on behalf of Greene. Miguel met Greene and Kirk between 2010 and 2011 in her capacity as a professional fitness trainer. She worked with Kirk for at least a year at his house.

During her visits to the house to do fitness training with Kirk, Miguel had seen Greene cleaning. When she was there, Greene was either present in the house or coming in or going out of the house. It appeared to her that Greene and Kirk were very close. Her understanding was that they had been together for several years and "when Kirk moved, [Greene] moved as well." Kirk mentioned on several occasions that Greene took care of him. Kirk had said he loved Greene; Greene had said he loved Kirk. Kirk had quite a collection of things and, on one occasion, Kirk indicated that Greene was going to "end up having to deal with it."

Miguel conceded, however, that Kirk never said that Greene and he had "vows." She did not know whether they had a sexual relationship. Kirk never told her that Greene

10

and he were domestic partners.  When asked whether Kirk ever spoke to her about filing a document to establish their relationship, Miguel indicated that "very vaguely" "[o]n one occasion."  She remembered a comment "having to do with papers regarding their relationship."

As to his family, Miguel heard Kirk mention that "his father was not very nice to him" and that was a "real painful thing for him."  Miguel "chose not to go further into that conversation."

Miguel was last in the Pebble Beach house sometime during the two month period before Kirk died on September 25, 2011.  She saw a pair of soiled men's underwear on the floor of the bathroom; they were soiled but not "grossly" so.

3. *Michael Greene*

Greene testified in his own behalf.

*Early Years*

Greene first met Kirk in 1965, when Greene was in second grade.  They went to the same school until high school.   During elementary school, Greene saw Kirk "[a]ll the time" outside of school.  They still remained close friends through high school and they saw each other on weekends.

According to Greene, Kirk attended college at San Diego State and Greene followed him there after obtaining an AA degree in Los Angeles.  Greene had a girlfriend, Maria Romanelli, from the time he was 18 years old until he was 23 years old, approximately 1978 to 1983.  Greene's girlfriend went with him when he transferred to San Diego State.

Greene moved back to the Los Angeles area at approximately the end of 1980 and he attended college at Dominguez Hills but he did not get a degree.  Greene lived in Hermosa Beach until he was 29 years old.  He worked with his brother in the brother's house painting business.

11

*1988 until the Alleged Signing of the Declaration of Domestic Partnership*

Greene testified that, in 1988 when he was 29 years old, he moved in with Kirk and lived with him for "[j]ust under a year." They spent every day together. When asked whether there was any sexual intimacy between them, Greene indicated that there was one "encounter" involving masturbation.

At the end of 1988, Greene found work at Warner Brothers and he moved to Northridge to be closer to work. He lived with his parents for approximately eight months and then moved to an apartment in Sherman Oaks.

In about 1996, Greene bought a condominium in Sherman Oaks.

Until February 1997, Greene worked at Warner Brothers and lived in Sherman Oaks. He saw Kirk on weekends. Greene left his position at Warner Brothers to go to work for Langman as a property manager.

Greene worked out of an office located a few doors down from Langman's office in the same building. According to Greene, he had enough time to do the property management job and work with Kirk on inventions. Kirk and Greene started an "invention business" and they had "two or three patents together." Kirk came into work to be with Greene and to "work on the invention business."

After the "invention business had taken its course," Kirk "stopped coming to the office" and Langman wanted to fire Greene. After Kirk intervened, Greene was allowed to continue to work for Langman until September 1998.

In September 1998, Greene began working for American Gourmet Foods, a friend's fruit stick business, in Malibu and he commuted from Sherman Oaks. Beginning in about December 1998, Greene stayed with Kirk, who lived closer to Greene's job in an apartment building on Wilshire Boulevard in Los Angeles. Greene went back to his Sherman Oaks condominium every couple weeks to pick up his mail. Greene's roommate continued to live in Greene's condominium.

12

Kirk lived in two different units while living in the Wilshire Boulevard apartment building.  At trial, Greene testified that, while Kirk was living in the first apartment, Greene and Kirk had a sexual encounter involving masturbation.

Kirk hired an assistant named Roy Magan, who cooked, cleaned, laundered, and ran errands for Kirk.  Roy came in at 4:00 or 5:00 p.m. and left in the morning.

According to Greene, there were a couple more sexual encounters between Kirk and him involving fellatio.  Neither of them had girlfriends.  Kirk said he loved Greene and Greene responded that he loved Kirk.

Greene worked in his friend's fruit stick business for one year and nine months, until his friend passed away.

For about nine months, Greene tried to start a computer business with his roommate.  Kirk supplemented Greene's income from the Sherman Oaks roommate so that Greene could pay his mortgage and have "living money."  The business "did not pan out."  According to Greene, Kirk said that "he would make it so [Greene] was taken care of for the rest of [Greene's] life."

In about 2004 or 2005, Kirk was "starting to stay in the house more."  Greene said he told Kirk, "I don't want to just sit in the house with you and your brother and never go out and never do anything."  Greene began to spend time in his Sherman Oaks home.  Kirk visited there.

Greene testified that, in April 2005, he attempted suicide.

In 2006, Greene was having some personal problems and he moved to the desert to be with his parents.  He sold the Sherman Oaks condominium and bought a house in Indio.  He obtained a job as senior front desk associate at the Marriott.  Greene spoke to Kirk every day and told Kirk that he loved him.  Kirk said that he loved Greene.  Kirk supplemented Greene's income.  According to Greene, in the summer of 2007, Kirk began calling and "begging" Greene to live with him again.

13

Greene claimed he injured his back while working at the Marriott.

Greene ultimately decided to move to Kirk's Wilshire apartment in Los Angeles. Kirk told Greene that "he was going to make sure [Greene] was taken care of for the rest of [Greene's] life." Greene left his Marriott job in February 2008, he rented his house to tenants, he sold his furniture, and he moved back in with Kirk on March 1, 2008. Kirk "fired" his assistant Roy the night before Greene moved back.

Kirk then hired Michael Apelian to cook and go to the market a couple of times a week. Apelian did not stay late into the night or overnight.

*The Alleged Signing of a Declaration of Partnership*

Greene testified that Kirk wanted to move away from his family; Kirk hated his brother and disliked his father. According to Greene, he told Kirk that their relationship had to "go to a new level" and he "wanted something official." Greene described the signing of the declaration of partnership as a surprise. One day, when Greene returned home from physical therapy, Kirk was at the dining room table with a notary; he asked Greene to come over and sit down. Kirk and he signed a declaration of partnership with the notary. Greene said that he understood that the declaration meant "it was like [they] were] married." According to Greene, Kirk said he was going to mail the signed declaration. Kirk insisted that the declaration be kept secret because "all havoc" would ensue if his father found out. They went out for a lobster dinner.

Greene claimed that Kirk had arranged for the notary; he did not know the notary's name or how to contact her. There were no other witnesses. Greene acknowledged that they did not take vows, they did not take a photograph of the signing, and their relationship was never solemnized by clergy. According to Greene, Kirk took the declaration away and Greene never saw it again and he never asked Kirk for a copy. Greene never looked on the Secretary of State website to see if the declaration had been

14

registered. At the time of trial, however, Greene knew that there was no declaration of domestic partnership on file with the Secretary of State.

Greene conceded there were no private written communications, such as cards, emails, or love letters, acknowledging the alleged domestic partnership. There was no written document, such as a card, email, or letter, in which either Kirk or he expressed love for the other. Aside from the alleged declaration of domestic partnership, there was nothing in writing stating that Kirk would support Greene for the rest of Greene's life.

In his deposition, Greene confirmed that Kirk and he did not have a sexual relationship until about 2009 or 2010. He stated that their relationship became sexual "after the signing" and they were "affectionate but not sexual before that."

At trial, Greene indicated that he might not have moved to Pebble Beach with Kirk if not for the alleged declaration of domestic partnership. He had stated in his deposition, however, that he would not have done anything differently and he would have still lived with Kirk even without domestic partnership status.

At trial, Greene also confirmed that he expected to be completely supported by Kirk once he signed the alleged domestic partnership agreement. He did not expect, however, to be responsible for Kirk's basic living expenses.

At trial, Greene explained that he never told anybody that Kirk and he had signed a domestic partnership agreement because it was a secret. He never told any family member about the domestic partnership before Kirk died. According to Greene, he kept the secret after Kirk passed away to honor Kirk's wishes. Kirk had not told Greene that he disclosed their domestic partnership to Greene's brother-in-law.

*Living in Pebble Beach*

In the fourth week of December 2009, Kirk and Greene moved to Pebble Beach. For about the first two months in the area, they stayed at the Embassy Suites, which was paid for by Langman, Kirk's father.

15

Together Kirk and Greene picked out a house in Pebble Beach for purchase. They moved into the house about May 2010. Kirk did not tell Greene exactly how the house was paid for. Langman was involved in the purchase of the house but Greene understood that Kirk owned the house. Neither Kirk nor Greene was working at this point. In later testimony, Greene acknowledged that Langman provided all the money to pay for the Pebble Beach house.

According to Greene, the main reason Kirk spoke to his father each month was to discuss credit card balances. Kirk received about $6,000 to $7,000 a month because he was on "Langman's payroll of L'Monde International," Langman's property management company, and Kirk received about $10,00 or $11,000 a month from the tenants living in a Beverly Hills house owned by Kirk. Greene understood that, although Kirk owned a 95 percent interest in the Beverly Hills property, Langman had provided all the money to pay for that house.

Greene testified that Kirk and he went shopping together and bought various things; Kirk was "into jewelry." Kirk bought music equipment and asked Greene what he wanted and what he should buy. They were "building a music studio in [Kirk's] house."

Greene bought a 2010 Cadillac and paid for it with the money Kirk gave him each month.

Greene testified that Kirk said that everything he owned also belonged to Greene. According to Greene, their sexual relationship continued.

Greene remembered Christina Miguel visiting the Pebble Beach house. Greene did not make the arrangements for her to come. Greene testified that he told her that he loved Kirk. Greene did not hear Kirk tell Miguel that he loved Greene.

Greene indicated that Kirk regularly spoke on the telephone to Kieran Murdy and Kirk paid her to talk with him. Greene heard Kirk tell Murdy that he loved her. Greene also heard Kirk tell Murdy that he loved Greene. Greene also spoke to Murdy and told

16

her that he loved her. Kirk also called Michael Apelian while they were living at the Pebble Beach house.

*Kirk's Collapse and the 911 Call*

Kirk collapsed in the hallway of his home on the night of September 25, 2011. Greene thought Kirk had tripped. Greene did not think it was a life or death situation because Kirk had fallen before and he thought Kirk was still alive.

Greene told Kirk to get up or he would call 911. Greene could not get Kirk up; Greene called 911. Greene testified that he called 911 about a minute and 15 seconds after Kirk collapsed.

At trial, Greene acknowledged that he did not hold Kirk's hand or stroke his head but he claimed that he sat down and held Kirk's arm. At his deposition, Greene answered "no" when he was asked, "[D]id you sit down next to Kirk, hold his hand, stroke his head, anything –?"

Before Kirk died, he appeared to Greene to be shivering. Greene learned that it was a life and death situation after the medical technicians tried to administer CPR. According to Greene, Kirk died in the hallway of the house at 1:00 in the morning.

Greene claimed he was unaware that Kirk was on a juice diet but he acknowledged that Kirk was drinking juice. He denied telling the sheriff that Kirk "juiced himself to death." Greene later learned that Kirk died from complications of diabetes.

Greene denied telling the sheriff that he needed Kirk's driver's license and he needed Kirk's credit cards to pay for his incidentals and expenses. He claimed that testimony to that effect would be a lie.

At trial, Greene confirmed that the sheriff's deputies had been trying to determine his relationship to Kirk. He could not recall what he told them. Greene agreed that he could not think properly and he was distraught for four or five days after Kirk died.

17

Kirk's body was taken away.

*Events in Pebble Beach After Kirk's Death*

Greene testified that he called his mother the night Kirk died. The next day, Greene spoke with the Langmans.

According to Greene, Langman told Greene that he should feel free to stay two or three weeks if he liked; they were going to come to clean the house and then sell it. Langman said he was going to send a check to Greene to help him move. Greene claimed that Langman said that he could have everything in the house and gave him permission to sell all the music equipment. Annie Langman (Annie)[8] got on the phone with Greene and they discussed cleaning.

Greene testified that the reason he asked for permission from Langman to sell the music equipment, even though he believed he was Kirk's domestic partner, was "courtesy to" Langman. He later testified that he wanted Langman's blessing not his permission. Greene acknowledged that Kirk bought the music equipment; he had not paid for any of it.

Greene acknowledged receiving a check for $5,000, dated September 25, 2011, from Langman. Greene testified that "$5,000 was not enough to get [him] all the way home" to Southern California and he acknowledged asking Langman for an additional $5,000.

As requested by Annie, Greene scheduled a cleaning crew headed by Lara Smith (Lara)[9] of Smitty's Janitorial. Greene denied asking Lara to clean Kirk's room first so the Langmans would not see its condition. When asked whether the coffee table in the front room was completely hidden by trash, dirty clothing, and dirty dishes, Greene responded

---

[8]     We will refer to Annie Langman by first name for the sake of clarity and not out of disrespect.

[9]     We will refer to Lara Smith as Lara for the sake of clarity and not out of disrespect.

18

that it "had not been cleaned for the day, yes. . . ." At his deposition, Greene acknowledged that there were two dirty couches in the living room but claimed he did not know it because Kirk had so many papers on top of them.

Greene's sister Jodi came to Pebble Beach. In his deposition, Greene had indicated that Jodi stayed overnight at the house with Langman's consent. When asked at trial why he needed consent if he believed that he was a domestic partner and owned the house, Greene denied asking for consent. Greene's brother arrived in Pebble Beach sometime later.

At Greene's direction, Lara helped Greene pack the room where he slept and kept his personal belongings. At that time, Greene's room contained prescription marijuana, marijuana paraphernalia, methadone, Hydrocodone, Norco, and Vicodin. Greene's doctor had prescribed methadone for him because he wanted to get off opiates. He had received prescription medication for his back injury. Greene claimed that, at that time, he was taking only the Hydrocodone and the marijuana. He admitted that he had snorted cocaine one time in the Pebble Beach house. Greene acknowledged previously trying morphine for which he had no prescription.

Greene acknowledged that the Pebble Beach house had a room filled with new music equipment. He called the music store where Kirk had bought a lot of it and arranged for someone from the store to look at the music equipment. Greene received a written offer to buy the equipment for $18,000. He had been present during the purchase of that equipment and understood it would be worth more if he were willing to take more time to sell it. Greene acknowledged that it was worth approximately $50,000 to $60,000 but explained that he sold at that price because he "needed money to get home and [he] was being rushed out of the house." The buyer wrote two checks to Greene, one for $11,000 and the other for $7,000, because Greene wanted the money to go into two different accounts so that "the logistics of . . . moving would be easier." The buyer

19

indicated that it would take two days, Wednesday and Thursday, to move the music equipment.

Langman arrived at the house on Thursday. Greene asked him to pay off his Cadillac. He also asked Langman to make good on a $1,000 check that Kirk had given him. At trial, Greene claimed the check was part of his monthly paycheck or allowance.

Langman witnessed the music equipment being taken out of the house and put in a van. Langman spoke with the buyer as he was loading the equipment. Langman told Greene that he wanted Greene out by the next day but, according to Greene, he did not say anything about the sale of the music equipment. After Annie said that was impossible, Langman revised the deadline to Saturday. Langman warned Greene three times that he had a relationship with the police.

A moving company came to the house to provide an estimate. The Langmans selected about five items for themselves. Greene did not want them to take the massage chair because, according to him, it was "a gift from Kirk for [Greene's] back."

On Saturday, Langman warned him to be out by Sunday or he would call the police and have him arrested for trespassing.

On Sunday October 2, 2011, Greene called the Sheriff's Office and complained that Langman was threatening him. Greene was "shocked out of [his] mind" when he was arrested for grand theft on Sunday. The sheriff's deputies arrived while Jodi was there; Langman was not present when he was arrested. The officers inquired about the music equipment. They took the house key, they took the checks for the music equipment, and they told him not to return to the house. Greene was handcuffed, placed in the back of a vehicle, and taken to jail.

When Greene was released from jail, his brother and he went to a hotel because he was not allowed to go back to the Pebble Beach house. His sister stayed at the hotel as well. Langman paid for the hotel.

20

On Tuesday, Lara, who had a key, let Greene and his brother Fred into the garage of the Pebble Beach house to collect his personal belongings. His recollection was that he made arrangements for movers to come at a later date. At trial, Greene testified that the garage did not contain all the property that he thought belonged to him.

At trial, Greene denied that he had the opportunity to collect any important papers during the period between Kirk's death on September 25, 2011 and the Langmans' arrival in Pebble Beach on Thursday September 29, 2011. He stated that he was incapacitated. He acknowledged, however, that he could have asked his sister, who arrived before the Langmans, to collect the papers that were important to his relationship with Kirk.

At trial, Greene denied that he was given the option of keeping any papers the cleaners were going to discard. In his deposition testimony, however, Greene indicated that the cleaning staff had asked him whether he wanted any of the papers and other property before it was thrown away.

At trial, Greene indicated that he had the opportunity to tell Lara about any particular artwork that he owned and wanted packed. He claimed that he identified artwork in the dining room. But in his deposition testimony, Greene confirmed that, while Lara was helping him pack his personal items, he had the opportunity to ask her to pack any artwork belonging to him but he did not identify any.

*Appellant's Failure to Identify any Items of Property as Belonging to Him*

Greene moved to Los Angeles to be with his sister Debbie and sometime thereafter Greene called attorney Lee Smith, who was representing the Langmans. Smith told Greene that Greene could not speak to the Langmans and he could not look through the property that had been in the house. Greene never received an answer to his letter demanding all that property from Smith.

Greene acknowledged, however, that he and his counsel met opposing counsel at a storage locker in Palm Desert. Kirk's safe was taken out of the locker and opened by

21

force in his presence. It did not contain a copy or original of a domestic partnership declaration.

Greene was given the opportunity to go through the approximately 50 to 60 sealed boxes in the storage locker. He opened and looked in two or three of the boxes but then he declined to examine the remaining boxes. Greene indicated that the boxes were piled high and deep, it was close to 100 degrees outside, he had a back injury, and he was unable to lift and move boxes. He claimed that it took about an hour to open the safe and he had only two hours to inventory the boxes but he could not recall who said there was a two-hour limit. No one prevented him from going through the rest of the boxes.

*Nature of Greene's and Kirk's Relationship*

When Kirk died, he was about five feet, seven inches tall and weighed 305 pounds. Greene initially agreed that Kirk had gained about 100 pounds over the last year and a half of his life but then he revised his answer, stating that when they moved up to Pebble Beach, Kirk weighed about 220 pounds. Greene indicated that he did not tell Kirk's father about Kirk's weight gain because he "did not know about that weight gain." Greene also said that he did not contact a physician about Kirk's weight problem on Kirk's behalf because Greene "did not know he had a weight problem beyond his training as a way to fix it." Greene then claimed that, about six weeks before Kirk died, he expressed concern to Kirk about his weight gain, and he was eventually able to persuade Kirk to make a doctor's appointment.

According to Greene, he asked Kirk several times over the years to get a checkup. Greene recalled Kirk going to the dentist and the psychiatrist. Greene knew Kirk was bipolar but Greene claimed that he did not see symptoms of that disorder. Greene did not help Kirk with his medications or monitor his medications to ensure that "he took what he needed to be healthy . . . ." Greene did not know the name of Kirk's psychiatrist or the

22

location of his office.  He could not recall whether he ever took Kirk to any medical appointment.  He did not know what medication Kirk was taking at the time he died.

When asked whether Kirk had diarrhea shortly before he died, Greene replied, "I don't know."  In subsequent testimony, Greene acknowledged that, about a week or so before Kirk died, he called in a cleaning service to clean Kirk's toilet because there was fecal matter on the outside.  Greene acknowledged that, during that same period, there was soiled underwear in the house .

Greene indicated he could be obsessively clean and liked to clean house.  He claimed to have seen only one pair of soiled underwear at any given time.  According to Greene, around the time Kirk died, Kirk was sleeping on the couch in the front room of the Pebble Beach house.  Greene denied that Kirk had been using an Odwalla orange juice container as a toilet in the front room.

Greene claimed to not understand that diarrhea was one of the causes of Kirk's death.  He said he was told Kirk's heart stopped.  He had never seen Kirk's death certificate or the coroner's report.  When he called the police to find out the cause of death, Greene did not say that he was Kirk's domestic partner.

Greene acknowledged that Kirk paid him $3,000 a month and stated that he understood the payment to be an allowance.  Greene denied being paid to cook, clean, and take care of the house.  In his deposition and trial testimony, Greene indicated the money was a gift.  At trial, Greene agreed that Kirk could have stopped paying that money at any time he wished.  According to Greene, Kirk did not generally like to be alone.  Greene indicated that Kirk was paying him for his company.  Greene testified that he was not required to perform any household duties to live with Kirk.

From February 28, 2008 until the day of trial on April 24, 2012, Greene never applied for work.  From May 2008 until Kirk died, the monthly payment of $3,000 was

Greene's only source of income. Greene confirmed that Kirk's only source of money was Langman.

Greene had an ongoing Workers' Compensation case relating to his work for Marriott and he was deposed in connection with that action. The attorney taking his deposition told him that he was testifying under oath and subject to the penalty for perjury. The attorney explained that it was a felony to make false statements in order to receive Workers' Compensation benefits. During that deposition, which took place on September 3, 2010, months after the move to Pebble Beach, Greene indicated that he lived with Kirk and he was Kirk's friend and roommate. When asked whether their relationship was platonic, Greene answered, "Yes."

Greene did not attend Kirk's funeral.

### 4. *Gerald Tsukimura*

Gerald Tsukimura was called as a witness on behalf of Greene. He worked for Monterey Transfer & Storage and he provided a quote for 2877 Coyote Road, Pebble Beach in about September or October 2011. The first time he went to the house, he saw property in piles and found the house in disarray. Tsukimura was told that the musical instruments, amps and key boards and mixers in one room were not being moved.

On a second visit to the property, Tsukimura and Greene walked through the property again.

On Tsukimura's third visit to the property, Annie was present and she told Tsukimura that the property in one pile was hers and it would be sent to the Langman residence. She indicated that some other property would be moved to the garage of Greene's sister and some other property was going to another property, to be determined later, for Greene. At that point in time, the music room was already empty.

A few days later, Tsukimura received a call from Annie, who informed him that Greene had been arrested for stealing or embezzling and "everything [was] going to go to

24

her." The Sheriff's Department instructed the movers to go to a music store, pick up equipment, and add it to the Langmans' storage.

Most of the items to be moved were used household goods. Annie's "pile went to her Palm Spring or Palm Desert address." Tsukimura indicated that property was dropped off at a storage facility.

B. *Witnesses called by Respondent Langman*

1. *Deputy Sheriff Moran*

Shaun Moran, a Monterey County Deputy Sheriff, testified out of order on Langman's behalf. He was one of the first deputies on the scene when Kirk passed away on September 25, 2011. Deputy Moran was dispatched at 2:00 a.m. and arrived before 2:30 a.m. In the case of a dead body, deputies try to determine whether or not the death was natural.

When he entered the Pebble Beach house, Deputy Moran saw stacks and piles of shipping boxes, some still unopened and some as tall as he stood. A couple of couches, a chair, some coffee tables, and a television on a stand were positioned close together in the middle of the living room. Dirty clothing, trash, debris, and empty and full cigarette boxes were strewn on the floor and almost completely covered the coffee tables and the couches. The place seemed filthy. Kirk's nude body was on the ground in the hallway between the living room and two back bedrooms.

Deputy Moran asked Greene about his relationship to decedent. Greene first said he was Kirk's roommate and later said he was Kirk's longtime friend. Greene never said that he was in a domestic partnership with decedent. At one point, Greene suggested that he took care of decedent and he was compensated for that service. When the deputy asked Greene about Kirk's next of kin, Greene named Kirk's father in Los Angeles.

Greene described what had occurred to Deputy Moran. He said he heard a noise while in his bedroom and went out to the hallway, where he found that Kirk had fallen.

25

Kirk was breathing but not conscious. Greene called 911 and stayed until the paramedics arrived. Greene informed Deputy Moran that the decedent was on a juice-only diet. Greene suggested that the decedent "juiced himself to death."

Greene offered to telephone decedent's father, Langman, and Deputy Moran remained in the room while Greene made the call. The deputy also spoke with Langman. Langman was concerned about the funeral arrangement for his son and indicated he would come the next day.

Deputy Moran took possession of the keys to a green Porsche parked in the garage because, in his opinion, the vehicle was in extremely good condition and extremely valuable. He was told that it was purchased in cash for decedent by his father. The deputy was concerned that the car might be driven by Greene or given to someone else.

Deputy Moran saw a large pile of soiled underwear in decedent's bedroom and took a photograph because it was "extremely unusual." Greene told the deputy that Kirk generally wore only brand new underwear and Kirk did not wash his clothing. The deputy also saw brown spots, which he believed to be fecal matter, on the toilet in the bathroom adjoining the decedent's bedroom. The deputy saw more soiled underwear to the left of the toilet and took a photograph. He also took photographs of decedent's body in the hall.

2. *Deputy Coroner Schumacher*

Diana Schumacher also testified on Langman's behalf. She was a detective with the Monterey County Sheriff's Office and, in September 2011, she was a Deputy Coroner. Part of her job as Deputy Coroner was to investigate solitary or unusual deaths reported to the Coroner's Office and to determine the cause and manner of death.

Sergeant Rodriguez paged Detective Schumacher shortly after 2:00 a.m. on September 25, 2011. Sergeant Rodriquez advised her of the condition of the house, the decedent, and the other occupant.

Detective Schumacher arrived at the scene by about 2:45 a.m. A small foyer opened into the main living area, a large room with vaulted ceilings. She described it as "a homeless encampment." There was a lot of debris, residual garbage, discarded clothing, packing boxes, cigarette butts, and burns on the sofa. An Odwalla orange juice bottle, which was found adjacent to a tattered sofa, contained urine. Greene indicated that Kirk was residing in the living area and he was not always able to get up to urinate.

The detective asked Greene what had happened that evening. Greene told her that Kirk had fallen in the hallway, and Greene had encouraged Kirk to get up and indicated to him that otherwise Greene would be forced to call 911 or take him to the hospital. At some point, Greene had returned to his bedroom. When he came back out, Greene realized that Kirk was still lying on the floor and he was now unconscious. Greene could not say how much time had elapsed. When Detective Schumacher asked Greene how long he had taken to call, he could not be specific.

Detective Schumacher examined decedent's nude body in part to determine his time of death. She knew his death was recent in that lividity was present but it was blanchable. She also found him "very cool to the touch" with rigamortis present in the jaws. She determined, based on his size of over 300 pounds and the warmth and condition of the residence, decedent "had been down for at least two hours, if not more." The report of the American Medical Response report stated that the ambulance had arrived at 1:33 a.m. The report indicated that decedent had been lying on the ground in the hallway for more than an hour before the 911 call. At trial, the detective expressed the opinion that decedent had been down for at least an hour before 911 was called.

Detective Schumacher saw large piles of clothing discarded throughout the residence. Greene identified his room and Kirk's room and he was "very emphatic that [Detective Schumacher] stay away from his room . . . ." There was "a pile of discarded

27

dirty undergarments" in the closet of Kirk's bedroom. There were boxes and other personal items on the bed in Kirk's bedroom.

Detective Schumacher found quite a few musical instruments in the house. Greene told her that all the music equipment belonged to Kirk. Greene indicated that the Porsche was also Kirk's. Detective Schumacher asked about any property that she regarded as being "of value" and, to all her inquires, Greene responded that the property belonged to Kirk. Although she could not specifically recall asking about jewelry, she typically asked about that type of property.

The detective asked Greene several times about Greene's relationship to Kirk because it was "imperative" to determine the "next of kin." She had experience with other cases involving same sex couples and she believed it was "imperative" to discover "the nature of their relationship." Greene said that he was Kirk's friend and a guest. Greene did not tell her anything that in "any way, shape or form" suggested to her that Kirk and Greene were domestic partners. Detective Schumacher described Greene as being "emphatically opposed to such a . . . designation."

Detective Schumaker spoke directly with Langman that evening. She described the condition of the residence and property that may have been of value and concern to the next of kin. Langman, who was clearly bereaved, indicated that he would be coming there "almost immediate[ly]." Langman was okay with leaving the musical instruments in the house. Langman authorized Greene to stay in the residence. The detective informed Greene that Langman would be arriving within about a couple of days.

As part of her investigation, Detective Schumacher took possession of decedent's checkbook, credit cards, driver's license, two Porsche keys, a black satchel, and perhaps a prescription vial. After she left the house and was on the driveway, Greene came out of the house and asked if she had taken Kirk's driver's license. He was agitated. The detective explained to him that she was required to take the license as part of her

28

investigation. Greene returned to the residence. A few minutes later, Greene came out again. He was "clearly agitated" and upset and he demanded to know where Kirk's credit cards were because he needed them to buy things. She explained that the credit card owner was now deceased and "he would have to obtain his own credit."

In her conversations with Greene that evening, Detective Schumacher did not find Greene to be distraught over and grieving for Kirk.

Detective Schumacher attended the autopsy of the decedent's body, which took place the following day on September 26, 2011. She stated that the cause of death was "a hypoglycemic state," essentially untreated diabetes. Obesity and diarrhea, which may have been present for some time in light of the piles of discarded clothing and undergarments, were contributing factors to the cause of death.

C. *Greene's Rebuttal Witness Following Langman's Motion for Judgment*

Greene's counsel called Greene as a rebuttal witness. Greene admitted that he had been asked about his relationship with Kirk. He said that he was in shock over Kirk's death and he did not yet believe Kirk was dead. He claimed that he still had in mind his promise to Kirk. He did not think he was "obligated in any way" to reveal his relationship to Kirk.

III

*Discussion*

A. *Motion for Judgment*

1. *Rebuttal Evidence*

Appellant Greene contends that the court erred in granting respondent's motion for judgment without affording him the opportunity to present rebuttal evidence.

Section 1000 provides in pertinent part: "All issues of fact joined in probate proceedings shall be tried in conformity with the rules of practice in civil actions." Civil Code section 631.8, subdivision (a), provides: "After a party has completed his

29

presentation of evidence in a trial by the court, the other party, without waiving his right to offer evidence in support of his defense or in rebuttal in the event the motion is not granted, may move for a judgment."  In ruling on a motion for judgment pursuant to Code of Civil Procedure 631.8, "[t]he court may consider all evidence received, provided, however, that the party against whom the motion for judgment has been made shall have had an opportunity to present additional evidence to rebut evidence received during the presentation of evidence deemed by the presenting party to have been adverse to him, and to rehabilitate the testimony of a witness whose credibility has been attacked by the moving party."  (*Ibid*.)

The court provided an opportunity for appellant's counsel to present rebuttal evidence and appellant's counsel recalled appellant.  It correctly refused to admit declarations into evidence.

"Except as otherwise provided by statute, [the Evidence Code] applies in every action before the Supreme Court or a court of appeal or superior court . . . ."  (Evid. Code, § 300.)  Evidence Code section 300 "makes the Evidence Code applicable to all proceedings conducted by California courts except those court proceedings to which it is made inapplicable by statute."  (Cal. Law Rev. Com. com., 29B Pt. 1A West's Ann. Evid. Code (2011 ed.) foll. § 300, p. 100.)

"In the absence of statutory permission, an affidavit is not competent evidence, although made under oath, because it is hearsay.  (*Fewel v. Fewel*, 23 Cal.2d 431, 438 . . . ; *Lacrabere v. Wise*, 141 Cal. 554, 556 . . . .)"  (*In re Estate of Horman* (1968) 265 Cal.App.2d 796, 805; see Evid. Code, § 1200 [hearsay rule].)  While affidavits (or declarations under penalty of perjury) and verified petitions may be received as evidence when offered in an uncontested probate proceeding (§ 1022, see Code Civ. Proc., § 2015.5), this was a contested proceeding.  "When a petition is contested, as it was here, 'affidavits and verified petitions may not be considered as evidence at a contested probate

hearing.' (*Evangelho v. Presoto* (1998) 67 Cal.App.4th 615, 620 . . . .)" (*In re Estate of Lensch* (2009) 177 Cal.App.4th 667, 676.)

Although appellant states in his brief that Jodi Dionne was in the courtroom at that time, he does not support that statement with a citation to the record. As indicated, appellant had filed declarations by a number of people, including the Dionnes. Appellant's counsel had told the court that "Mr. Dionne was here to testify" but "the rest of [the declarants] are not available as witnesses." Counsel's statements indicate that Jodi Dionne was not present in the courtroom.

"It is appellant's burden to show error by an adequate record. (*In re Kathy P.* (1979) 25 Cal.3d 91, 102.) The record indicates that there were no other individuals who were available to testify and whom appellant's counsel wished to call as witnesses at the time of trial. It does not establish that the court improperly refused appellant's offer of rebuttal evidence.

2. *Objections Based on Priority*

a. *Governing Law*

Section 8460 provides: "If the decedent dies intestate, the court shall appoint an administrator as personal representative." Section 8461 establishes the order of priority for appointment. First preference is given to the "[s]urviving spouse or domestic partner as defined in Section 37."[10] (§ 8461, subd. (a).) A parent has lower priority. (See

---

[10]    Section 37 provides: "(a) 'Domestic partner' means one of two persons who have filed a Declaration of Domestic Partnership with the Secretary of State pursuant to Division 2.5 (commencing with Section 297) of the Family Code, provided that the domestic partnership has not been terminated pursuant to Section 299 of the Family Code. [¶] (b) Notwithstanding Section 299 of the Family Code, if a domestic partnership is terminated by the death of one of the parties and Notice of Termination was not filed by either party prior to the date of death of the decedent, the domestic partner who survives the deceased is a surviving domestic partner, and shall be entitled to the rights of a surviving domestic partner as provided in this code." Family Code section 297 et seq.

31

§ 8461, subd. (e).) Absent a statutory basis, the court cannot refuse a surviving spouse's or surviving domestic partner's petition for appointment or appoint someone with a lower priority under the controlling statute. (See *In re Estate of Garrett* (2008) 159 Cal.App.4th 831, 836-837; *Estate of Leslie* (1984) 37 Cal. 3d 186, 200 [former § 422].)

For purposes of this appeal, we assume that a putative surviving domestic partner as defined in section 37 qualifies as a surviving domestic partner within the meaning of section 8461. (See *In re Domestic Partnership of Ellis* (2008) 162 Cal.App.4th 1000, 1009 [putative spouse doctrine applies to registered domestic partnerships], disapproved on another ground in *Ceja v. Rudolph & Sletten, Inc.* (2013) 56 Cal.4th 1113, 1128, fn. 12 (*Ceja*); *Estate of Leslie*, *supra*, 37 Cal. 3d at p. 200 [putative spouse is a surviving spouse within meaning of former section 422]; but cf. *Velez v. Smith* (2006) 142 Cal.App.4th 1154, 1174 [appellate court "assume[d] the Legislature was aware of the existing putative spouse doctrine, and if inclined to do so could have either expressly added to the Domestic Partner Act the rights granted to putative spouses, or amended [Family Code] section 2251 [putative spouse status] to include within its reach putative domestic partners. [Citations.]"].) We further accept that, to establish putative status, a petitioner must prove a good faith, i.e. a genuine and honest, belief that he or she was a validly registered domestic partner under a subjective standard. (See *Ceja* , *supra*, 56 Cal.4th at pp. 1116, 1128 [wrongful death action by "putative spouse" as defined by statute] (*Ceja*); see also *id*. at p. 1121, fn. 5 [putative spouse doctrine codified in a number of statutes].)

b. *Sufficiency of Evidence to Support Findings Related to Putative Status*

Appellant asserts that the court's factual findings were not supported by substantial evidence.

---

the Domestic Partner Registration Act, sets forth the requirements for registering as domestic partners and the rights and obligations of registered domestic partners.

The court clearly found appellant Greene lacked credibility as a witness based on inconsistent statements made by him and his conduct following Kirk's death, as described in the statement of decision. The court explained that appellant "provided no credible or persuasive evidence establishing that he was decedent's 'putative registered domestic partner.' " The court found that appellant Greene's "unguarded statements to Deputy Moran and Detective Schumacher, as well as his testimony in his workers' compensation action coupled with the myriad of inconsistencies between [appellant's] trial and deposition testimony in the current action establish that he did not believe he was in a domestic partnership with Kirk Langman." The court determined that appellant and the deceased were merely friends and roommates and not domestic partners or putative domestic partners. It expressly stated that Greene and his witnesses were neither "credible nor persuasive."

"Except as otherwise provided by law, a party has the burden of proof as to each fact the existence or nonexistence of which is essential to the claim for relief or defense that he is asserting." (Evid.Code, § 500.) " 'Burden of proof' means the obligation of a party to establish by evidence a requisite degree of belief concerning a fact in the mind of the trier of fact or the court." (Evid. Code, § 115; see Evid. Code, § 190 [" 'Proof' is the establishment by evidence of a requisite degree of belief concerning a fact in the mind of the trier of fact or the court"].) In general, "[t]he burden of producing evidence as to a particular fact is on the party against whom a finding on that fact would be required in the absence of further evidence." (Evid. Code, § 550, subd. (a).) Under the foregoing principles, appellant had the burden of proving that decedent and he were registered domestic partners or putative registered domestic partners. If the "requisite degree of conviction is not achieved [in the mind of the trier of fact] as to the existence of a particular fact, the trier of fact must assume that the fact does not exist." (Cal. Law Revision Com. com, 29B Pt. 1B West's Ann. Evid.Code (2011 ed.) foll. § 500, p. 309.)

33

The statement of decision in this case reflects that the court found appellant had failed to carry his burden of proof, largely due to his lack of credibility.

"In reviewing the sufficiency of the evidence, this court is guided by well-settled principles. '[T]he power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted,' to support the trial court's findings. (*Crawford v. Southern Pacific Co.* (1935) 3 Cal.2d 427, 429 . . . ; *Jessup Farms v. Baldwin* (1983) 33 Cal.3d 639, 660 . . . .) 'We must therefore view the evidence in the light most favorable to the prevailing party, giving [him] the benefit of every reasonable inference and resolving all conflicts in [his] favor . . . .' (*Ibid*.)" (*Estate of Leslie* (1984) 37 Cal.3d 186, 201.) "The fact that it is possible to draw some inference other than that drawn by the trier of fact is of no consequence. [Citation.]" (*Jessup Farms v. Baldwin* (1983) 33 Cal.3d 639, 660.) Reviewing courts do not reconsider the credibility of witnesses, reweigh the evidence, or resolve conflicts in the evidence. (See *Leff v. Gunter* (1983) 33 Cal.3d 508, 518.) "[I]t is not a proper appellate function to reassess the credibility of the witnesses." (*People v. Jones* (1990) 51 Cal.3d 294, 314-315.)

The trier of fact is not bound to accept testimony that it finds lacks credibility. (See *Thompson v. City of Long Beach* (1953) 41 Cal.2d 235, 246.) We find unavailing appellant's claim that he provided undisputed evidence that decedent and he executed and notarized a Declaration of Domestic Partnership, decedent "affirmatively represented" that he would mail the declaration to the California Secretary of State, and secured his "solemn promise to never discuss the domestic partnership with anyone . . . lest [decedent's] father find out which would cause [decedent] undue aggravation from his family." The probate court was in a better position than this court to assess Greene's credibility and it rejected his testimony. (Cf. *Estate of Leslie*, *supra*, 37 Cal.3d at p. 203.)

34

Appellant specifically argues that Detective Schumacher's opinion about how long it took him to call 911 was "pure speculation," the detective was not competent to testify on that matter, and she had not been disclosed as an expert. Since no timely and specific objection was interposed at the time of her testimony, any objection to its admission was forfeited. (See Evid. Code, § 353.) Evidence admitted without objection is considered in reviewing the sufficiency of the evidence. (See *Parsons v. Easton* (1921) 184 Cal. 764, 769.)

Appellant also claims that the court assumed facts not in evidence when it concluded that he "emphatically was opposed to any designation as Kirk Langman's domestic partner." Detective Schumaker testified that she repeatedly asked appellant about his relationship to the decedent. She had experience with same sex couples in other cases and believed that it was "imperative" to discover "the nature of their relationship." Appellant told the detective that he was a friend and guest of the decedent and he did not suggest in any way that they were domestic partners. The detective testified that appellant was "emphatically opposed to such a . . . designation." The court's finding was supported by the evidence.

" ' "Although an appellate court will not uphold a judgment or verdict based upon evidence inherently improbable, testimony which merely discloses unusual circumstances does not come within that category. [Citation.] To warrant the rejection of the statements given by a witness who has been believed by a trial court, there must exist either a physical impossibility that they are true, or their falsity must be apparent without resorting to inferences or deductions. [Citations.] Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends." ' [Citation.]" (*People v. Maciel* (2013.)

Appellant has failed to demonstrate that the court's findings related to the nature of his relationship to the decedent were unsupported by substantial evidence.

c. *Alleged Bias*

Appellant claims that the court's findings were the product of its bias against homosexuals.

" 'A fair trial in a fair tribunal is a basic requirement of due process.' (*In re Murchison* (1955) 349 U.S. 133, 136, 75 S.Ct. 623, 99 L.Ed. 942.) . . . The operation of the due process clause in the realm of judicial impartiality, then, is primarily to protect the individual's right to a fair trial." (*People v. Freeman* (2010) 47 Cal.4th 993, 1000-1001 (*Freeman*).)

The mere appearance of bias, however, does not require judicial disqualification as a matter of due process. (*Id*. at pp. 1000-1006.) Due process requires judicial disqualification where the circumstances, objectively viewed, establish a probability of actual bias. (*Id*. at pp. 996, 1006.) The due process clause "operates only as a 'fail-safe' and only in the context of extreme facts." (*Id*. at p. 1006.) Circumstances that "involve the mere appearance, but not the probability, of [judicial] bias—should be resolved under more expansive disqualification statutes and codes of judicial conduct. (*Ibid*.)" (*Id*. at p. 1005.)

In his brief, appellant Greene states: "As detailed in the Final Report of the Sexual Orientation Fairness Subcommittee of the Judicial Council's Access and Fairness Advisory Committee . . . , trial courts often fail to consider that . . . a gay male litigant may not act the same way as a judge's 'married friends,' and [this failure] is bias." But appellant does not point to any homophobic remarks or comments about homosexual relationships by the probate court. Instead, appellant refers us to the court's comment that followed his counsel's assertion that he did not know he had a right to the house or property even though he believed he was Kirk's domestic partner. The court responded:

36

"Typically a married couple upon the death of one of them does not think he or she needs to move out of their house. I mean, typically a married couple thinks this is our house and we're going to stay here and if one of them dies, the other one gets to stay there." Appellant argues that "the court compared the relationship between [decedent and him] through the lens of a married couple."

While judicial bias may exist where a judge harbors "preconceived ideas based on stereotypes" (*Hall v. Harker* (1999) 69 Cal.App.4th 836, 843, disapproved on other grounds in *Freeman*, *supra*, 47 Cal.4th at p. 1006, fn. 4, and *Casa Herrera, Inc. v. Beydoun* (2004) 32 Cal.4th 336, 349), we fail to discern any probability of actual bias from the court's limited remark regarding married couples. We see no "pattern of conduct by the judicial officer that rendered a fair trial impossible." (See *Freeman*, *supra*, 47 Cal.4th at p. 1006, fn. 4.) Appellant was claiming to be a putative registered domestic partner under the Domestic Partner Act (Family Code, § 297 et seq.) analogous to a putative spouse.[11] If appellant was concerned about possible misconceptions regarding homosexual domestic partners as compared to heterosexual married couples, he should have presented expert testimony to dispel them.

---

[11] The Domestic Partner Act (Act) establishes: "Registered domestic partners shall have the same rights, protections, and benefits, and shall be subject to the same responsibilities, obligations, and duties under law, whether they derive from statutes, administrative regulations, court rules, government policies, common law, or any other provisions or sources of law, as are granted to and imposed upon spouses." (Fam. Code, § 297.5, subd. (a).) The Act further provides: "A surviving registered domestic partner, following the death of the other partner, shall have the same rights, protections, and benefits, and shall be subject to the same responsibilities, obligations, and duties under law, whether they derive from statutes, administrative regulations, court rules, government policies, common law, or any other provisions or sources of law, as are granted to and imposed upon a widow or a widower." (Fam. Code, § 297.5, subd. (c).) "[A] surviving putative spouse is entitled to first preference for letters of administration." (*Estate of Leslie* (1984) 37 Cal.3d 186, 204.)

37

The court's determination that appellant's evidence was not credible or persuasive does not demonstrate bias even when considered with the court's remark regarding married couples. "[W]hen the state of mind of the trial judge appears to be adverse to one of the parties but is based upon actual observance of the witnesses and the evidence given during the trial of an action, it does not amount to that prejudice against a litigant which disqualifies [the judge] in the trial of the action. It is [the judge's] duty to consider and pass upon the evidence produced before him [or her], and when the evidence is in conflict, to resolve that conflict in favor of the party whose evidence outweighs that of the opposing party." (*Kreling v. Superior Court of Los Angeles County* (1944) 25 Cal.2d 305, 312.)

In this case, appellant has not shown a probability of actual judicial bias violative of due process.

d. *Putative Spouse Doctrine*

In its statement of decision, the probate court stated that Greene was required to "establish that the putative spouse doctrine applies by proving both he and Kirk Langman intended to register their alleged domestic partnership and that he had a reasonable, good faith belief that the registration occurred." The court indicated that this was an objective standard. It concluded that Greene had failed to make such a showing.

Subsequent to the judgment in this case, the California Supreme Court considered in *Ceja*, *supra*, 56 Cal.4th 1113 whether or not the good faith inquiry for determining putative spouse status under the wrongful death statute (Code Civ. Proc., § 377.60)[12] was a purely subjective test. (*Id*. at p. 1116.) The Supreme Court recognized that since the decision of *In re Marriage of Vryonis* (1988) 202 Cal.App.3d 712 (*Vryonis*), appellate

_____

[12]    Code of Civil Procedure section 377.60, subdivision (b), provides: "As used in this subdivision, 'putative spouse' means the surviving spouse of a void or voidable marriage who is found by the court to have believed in good faith that the marriage to the decedent was valid."

courts, considering putative spouse doctrine in various contexts, had "been unanimous in holding the good faith inquiry [with respect to putative spouse status] is objective in nature. [Citations.]" (*Ceja*, *supra*, 56 Cal.4th at p. 1126.)

In *Ceja*, the Supreme Court concluded "section 377.60 contemplates a subjective standard that focuses on the alleged putative spouse's state of mind to determine whether he or she maintained a genuine and honest belief in the validity of the marriage." (*Id*. at p. 1116.) It stated: "Good faith must be judged on a case-by-case basis in light of all the relevant facts, such as the efforts made to create a valid marriage, the alleged putative spouse's background and experience, and the circumstances surrounding the marriage, including any objective evidence of the marriage's invalidity. Under this standard, the reasonableness of the claimed belief is a factor properly considered along with all other circumstances in assessing the genuineness of that belief. The good faith inquiry, however, does not call for application of a reasonable person test, and a belief in the validity of a marriage need not be objectively reasonable." (*Ibid*.) The court disapproved of *Vryonis* and its progeny "to the extent they are inconsistent with the views expressed" in *Ceja*. (*Id*. at p. 1128, fn. 12.) We assume that, for purposes of appointing an administrator of an estate, the issue whether or not a person is a putative registered domestic partner involves a subjective inquiry as described by *Ceja*.

Appellant asserts that "all the elements of the putative spouse doctrine have been established" since the trial court supposedly stated, in ruling on the motion for judgment, that "it believed that [appellant] had believed that he had entered into a domestic relationship, and did not need any further evidence on the point . . . ." This is a mischaracterization of the record.

After the court announced its tentative decision to grant the motion for judgment in favor of respondent, it indicated that the question was whether appellant's counsel could present additional rebuttal evidence or evidence to "rehabilitate Mr. Greene."

39

Appellant's counsel suggested that Jodi Dionne could corroborate appellant's state of mind with regard to "making any claim about his domestic partnership rights or domestic partnership status, that wasn't his frame of mind at all." The court replied, "And I believe that. I mean, with or without testimony, I believe that."

The court's remark merely acknowledged appellant was not in the state of mind to claim he was a domestic partner; it did not say that it believed appellant had a genuine and honest subjective belief that he was a registered domestic partner. To the contrary, the court's comments preceding that remark indicate that Greene's credibility needed rehabilitation. In its statement of decision, the court clearly indicated that it disbelieved and rejected Greene's testimony that decedent and he had signed a declaration of domestic partnership, which decedent had promised to send to the California Secretary of State. The court expressly found, based on specified evidence, that Greene "did not believe he was in a domestic partnership with Kirk Langman" Accordingly, any error in the court's articulation of the requirement of "good faith" is harmless on the record before us and cannot serve as a basis for reversal. (See Cal. Const., art. VI, § 13.)

3. *Objections Based on Alleged Good Cause to Withhold Authority from Father*

Probate Code section 10452 provides: "Unless an interested person objects . . . to the granting of authority to administer the estate under this part [IAEA] and the court determines that the objecting party has shown good cause why the authority to administer the estate under this part should not be granted, the court shall grant the requested authority."

The court did not find that Greene had made an adequate showing of good cause for denying Langman the authority to administer his son's estate. In its statement of decision, the court stated: "[Greene] was given the opportunity to look in all of the boxes in storage in Southern California that had been shipped from the Pebble Beach House in order to identify any property that he alleges belongs to him. . . . [Greene] presented no

40

credible evidence that [respondent Langman] is in possession of property which belongs to [Greene]." It further indicated that appellant had no legal right to inherit from the decedent since he was neither the decedent's registered domestic partner nor his putative registered domestic partner.

Greene now complains that Langman provided no evidence "that he was the owner of any of the property contained in the decedent's and [his] home." He claims that the court erroneously placed the burden of proof of ownership on him.

As appellant Greene indicates, there is a rebuttable presumption that "[a] person who exercises acts of ownership over property is . . . the owner of it." (Evid. Code, § 638.) The presumption, however, affects only the burden of producing evidence. (Evid. Code, § 630.) Evidence Code section 604 provides: "The effect of a presumption affecting the burden of producing evidence is to require the trier of fact to assume the existence of the presumed fact unless and until evidence is introduced which would support a finding of its nonexistence, in which case the trier of fact shall determine the existence or nonexistence of the presumed fact from the evidence and without regard to the presumption. Nothing in this section shall be construed to prevent the drawing of any inference that may be appropriate."

Langman dispelled any presumption regarding property ownership by presenting evidence that Greene acknowledged to Detective Schumacher that the musical equipment and other property of value about which the detective inquired belonged to Kirk. The presumption disappeared and it remained appellant's burden to prove the factual allegations of his written objections as in an ordinary civil action. (§ 1000; Evid. Code, §§ 500, 604.)

Greene testified that he had sold all his furniture before he moved back in with Kirk on March 1, 2008. He conceded Kirk bought all the music equipment. In addition, the evidence also showed that, consistent with the court's prehearing order, appellant was

41

afforded an opportunity to look through all the boxes placed in storage and he did not identify any item as belonging to him.

Although appellant now claims that he was not "given a fair opportunity to go through the storage unit," the record does not support that assertion. He witnessed the opening of Kirk's safe, he looked through a couple of boxes, and then he declined to examine the remaining boxes in storage. The record does not disclose that he ever asked for a further opportunity to examine the property in storage.

It remained appellant Greene's burden to prove his allegation that Langman had wrongfully taken his property but the court did not find Greene's evidence credible. It is not our role to reassess Greene's credibility. (See *People v. Jones*, *supra*, 51 Cal.3d at pp. 314-315.) Consequently, we uphold the court's implicit determination that Greene failed to show good cause for disallowing Langman the authority to administer his son's estate.

B. *Discovery Sanction*

Appellant Greene asserts that there was no evidentiary basis supporting the court's $4,500 discovery sanction, which was imposed in connection with respondent's successful motion to compel his deposition. He implies that the evidence was lacking because respondent's counsel "simply asked for $5,360.00 in legal fees" and failed to specify the number of hours spent preparing the motion. He claims that sanction "suffers from the same deficiency" as the sanction imposed in *In re Marriage of Niklas* (1989) 211 Cal.App.3d 28 (*Marriage of Niklas*). His reliance on that case is misplaced.

In *Marriage of Niklas*, the court ordered the wife's counsel and the wife, jointly and severally, to pay sanctions to husband in the amount of $45,000 after the court had repeatedly ordered them to complete depositions. (*Id*. at pp. 31-33.) "In support of the imposition of monetary sanctions, husband submitted a summary of attorneys' fees and costs which reflected a total of nearly $51,000." (*Id*. at p. 37.) The attached "seven pages of itemized entries," included a period before the court's discovery orders and provided

42

only a cursory description of "the services for which these fees and costs were incurred. . . ." (*Ibid*.) In granting writ relief, the court of appeal explained: "We are unable to determine from this record what portion of the sanctions imposed was based on fees and costs incurred as a result of the disregard of discovery orders by [counsel] and his client. For example, the figures submitted by husband include amounts incurred prior to and including the March 30, 1988, hearing at which [counsel] was ordered to answer deposition questions. At this hearing, husband's request for sanctions was denied with prejudice. Therefore, only fees and costs incurred after March 30, 1988, could serve as a basis for the award of the sanctions here at issue." (*Id*. at p. 37-38.)

In this case, respondent Langman's counsel provided a declaration stating that his hourly rate in this matter was $350 and Langman had incurred $5,360 in attorney fees for counsel's services in researching and preparing the motion to compel Greene's deposition. Those fees included "conferring with counsel and witnesses, research and drafting the Motion and supporting documents," and "three (3) anticipated hours for responding to any Opposition and attending" the March 9, 2012 hearing on the motion. It does not appear, as was the situation in *Marriage of Niklas*, that the sanction request encompassed fees for services unrelated to the specified discovery abuse.

A monetary sanction for discovery misuses may include attorney's fees incurred as a result of that conduct. (See Code Civ. Proc., § 2023.030, subd. (a); see also Code Civ. Proc., § § 2025.450, subd. (g)(1) [failure of party deponent to appear].) The declaration of respondent's counsel established that respondent had already incurred $4,310 in attorney's fees to bring the motion to compel, which may be easily calculated by excluding the anticipated three hours of attorney's fees ($5,360 minus $1050 [3 x $350]). The reporter's transcript of the March 9, 2012 motion hearing indicates it was relatively brief. It is reasonable to infer from Langman's failure to document the actual attorney's fees incurred to reply to Greene's opposition, the brevity of the hearing on the motion to

43

compel, and the amount of the sanction imposed by the court that the court, based on its own observation, included attorney's fees (at his hourly rate of $350) for counsel's appearance at the March 9, 2012 hearing ($4,310 plus $190 equals $4,500). The declaration of respondent's counsel set forth sufficient facts to support the monetary sanction imposed and appellant has failed to show error. (See *Denham v. Superior Court* (1970) 2 Cal.3d 557, 564.)

## DISPOSITION

The judgment is affirmed.

_____

ELIA, J.


WE CONCUR:




_____

RUSHING, P. J.




_____

PREMO, J.




*Estate of Langman; Langman v. Greene*

H038800


45